[Civ. No. 14181. First Dist., Div. Two. May 4, 1950.]

JOHN E. PHELPS, JR., et al., Appellants, v. ROGER LOUPIAS et al., Defendants; ELI ROSEN, Respondent.

Alfred F. Taddeucci, Eugene H. O'Donnell and Ralph Bancroft for Appellants.

Morris M. Grupp for Respondent.

GOODELL, J.—Appellants sued Roger Loupias, Eli Rosen and several fictitious defendants for declaratory relief, to foreclose a chattel mortgage, and for damages arising from the alleged conversion of personal property. The court decided that the chattel mortgage held by appellants constituted no lien prior to that of defendant Rosen, and awarded judgment in favor of Rosen for his costs, and against Loupias for $12,000 and interest. This appeal followed.

A laundry business in San Francisco known as The Splendid French Laundry was, on November 2, 1946, owned solely by defendant Loupias. On that day a "joint adventure agreement" was entered into between Roger Loupias, Eli Rosen, Warren Cochran and A. C. Ireland, wherein they agreed to carry on the business as joint adventurers. It provided that Ireland was to be general manager and outside man, and Loupias inside production manager. Rosen and Cochran were not required to devote any specific time or attention to the business. The interests of the parties were set forth as Loupias 33⅓ per cent, Ireland 33⅓ per cent, Rosen 16⅔ per cent and Cochran 16⅔ per cent.

Rosen and Cochran later purchased Ireland's 33⅓ per cent interest and thereafter the business was owned and operated by Loupias, Rosen and Cochran.

On August 27, 1947, these three entered into a writing dissolving their joint venture, which was published the next day in "The Recorder." It recited that Rosen and Cochran had theretofore "sold, assigned, transferred and delivered to Roger Loupias . . . their right, title, equity and interest" in the business "and all of its assets, including the good will thereof." The sequence of events in this change of ownership is fully shown by the findings as will presently appear.

It should first be noted that *title to the machinery and equipment which enabled the business to operate had never become vested in any of the persons running the laundry.* Loupias did not have title in the first place; the Loupias-

Ireland-Rosen-Cochran group never acquired it; the survivors, Loupias-Rosen-Cochran, never did so; and when Loupias again took over he got no title to it. The title to the machinery and equipment had been retained under a conditional contract of sale dated August 1, 1946, between West Coast Laundry Machinery Company, the seller, and Loupias, the buyer, and on the dissolution on August 27, 1947, there was still owing thereon upwards of $12,000. This fact is of importance since that property is the subject matter of appellants' chattel mortgage and respondent Rosen's conditional sale contract, with which this litigation is concerned.

Rosen and Cochran, as fairly appears from the record, were anxious to get out; they had already put considerable money into the business to keep it going. Loupias, at the same time, was anxious to get the business back into his own hands. Another laundry operator was standing by, apparently ready to pay more than Loupias for the business, and seemingly one of the reasons for the rather hasty transfer, if not *the* reason, was Loupias' desire to buy it for himself.

Apparently Cochran's interests were handled throughout the transfer by Rosen, and in his name, under some arrangement between themselves which does not appear from the record but which is not presently material since Cochran is not a party to the litigation. The findings speak of Rosen's interest, apparently including therein Cochran's.

The various steps in the transfer of the Rosen-Cochran interest to Loupias are set forth in the findings, which may be paraphrased as follows: on August 22, 1947, plaintiff John E. Phelps, Jr. lent Loupias $12,000 in the form of a cashier's check payable to Rosen, whereupon Loupias, *in his individual capacity,* executed to Phelps a promissory note payable seven days later. Theretofore Loupias had told Phelps that he was buying Rosen's interest and that he had no other indebtedness against the business; that there were no outstanding liens, mortgages or conditional sales contracts against it, and that the $12,000 would pay Rosen in full and leave the laundry in the hands of Loupias free and clear of debts of every kind.

Loupias had also told Phelps that he did not want him to tell Rosen that he was making the loan, or to make any inquiry of Rosen respecting the business. Phelps believed these statements, made no investigation of his own, and purposely kept from Rosen all information of his loan, and in making the loan he relied solely on these representations.

The check for $12,000 being a cashier's check, did not disclose its source. Loupias gave it to Rosen as part payment for Rosen's interest, the agreed purchase price of which was $43,000, payable $12,000 in cash and $31,000 to be evidenced by a conditional sales contract covering the furniture, fixtures and equipment.

On August 25, the transfer of Rosen's interest to Loupias was completed by the delivery to Rosen of the $12,000 check and on that day Loupias executed with Rosen a conditional sales contract covering all the furniture, fixtures and equipment, to secure to Rosen the $31,000 balance.

Rosen, on receiving the $12,000 check, learned from an attorney who had represented Phelps in his negotiations with Loupias, that it had in fact come from Phelps, and telephoned to Phelps that he had the check, inquiring whether he had lent this money to Loupias, and informing him that if so, there was no security to cover the loan; further that he had another customer to purchase the laundry, and if Phelps desired to protect himself, he (Rosen) would return the check to him. To this Phelps replied in substance: ''That is my business and that it is none of your business what my dealings with Mr. Loupias are.''

On August 29 [actually the *27th*] the Loupias-Rosen-Cochran venture was duly dissolved.

On September 1 (which was after the telephone conversation, after the dissolution, and after the execution of the Rosen-Loupias conditional sales contract) Loupias took Phelps to the office of his attorneys, where he executed a new note to appellants for $12,000, together with a chattel mortgage securing it, covering all the furniture, fixtures, and equipment in the laundry, *and being the same property that had been already covered by the conditional sales contract which Loupias had made with Rosen to secure to Rosen the balance of the purchase price of his interest.* The chattel mortgage was recorded by Phelps on October 28, 1947, and on learning of this six days later through a commercial publication, Rosen caused his counsel to communicate these facts to Loupias' attorneys.

During the time prior to the execution of either of the notes to Phelps by Loupias, and prior to the execution of the Rosen-Loupias conditional sales contract, the major portion of the equipment and machinery in the laundry was under purchase from West Coast Laundry Machinery Company on the conditional sales contract already mentioned, dated August 1, 1946,

on which a balance of over $12,000 was owing. After the execution of the Rosen-Loupias conditional sales contract Rosen purchased the West Coast's contract and took an assignment thereof upon paying it in full the $12,362.22 balance.

The day after Rosen received the new conditional sales contract signed by Loupias, to wit, on August 26, Rosen assigned it to American Trust Company.

Thereafter Loupias defaulted on that contract and Rosen was compelled to repurchase it from American Trust Company, paying it therefor $28,618.28. Shortly thereafter Rosen took possession of the property covered by his contract.

On August 6, 1948, Rosen notified Phelps in writing that there was due him on the equipment, furniture and fixtures $28,618.28 and that Phelps could obtain the property by paying him (Rosen) that sum.

No part of the $12,000 has been paid by Loupias to Phelps.

The court found that it was not true that Rosen unlawfully took or carried away the personal property referred to herein, or converted or disposed of it to his own use.

From those findings the court drew the conclusions: (a) That the loan of $12,000 from Phelps to Loupias was made to him in his individual capacity and not as a member of the partnership, and that Rosen had no liability for such loan. (b) That the Rosen-Loupias conditional sales contract of August 25, 1947, securing the $31,000 balance of the purchase price of Rosen's interest, constituted a first lien against all the furniture, fixtures and assets, with the exception of the lien of West Coast under its conditional sales contract. (c) That upon the purchase by Rosen of the West Coast contract Rosen had an unqualified first lien on all such furniture, fixtures, equipment and machinery. (d) That Phelps was not entitled to any relief against Rosen by reason of anything alleged in the complaint and that he was not damaged in any amount by any of the actions of Rosen. (e) That Phelps was entitled to judgment against Loupias for $12,000 and that, insofar as Rosen was concerned, the chattel mortgage executed by Loupias to Phelps constituted no lien prior to that of Rosen.

No claim is made that the findings are not supported by the evidence.

The conclusion that the $12,000 loan from Phelps to Loupias was a personal loan and not made to the partnership is fully supported by the facts found which need not be recounted. It is sufficient to recall the conversation wherein

Rosen, *a retiring partner* (trying to protect Phelps by letting him know what was planned, before he used the $12,000 to pay off the West Coast), was told to mind his own business. Once the personal nature of that loan is established, most of appellants' argument loses its force and their citations of code sections and authorities become academic and irrelevant.

The record is practically free from conflict. Phelps did not take the stand on his own behalf. He testified as an adverse witness called by defendant Rosen, under section 2055, Code of Civil Procedure. The only witness called by plaintiffs was Loupias, *a defendant against whom plaintiffs wound up with a $12,000 judgment by default.*

 The only question in the case is as to the priority as between the Rosen-Loupias contract *of August 25* and the appellants' chattel mortgage *of September 1.*

As to the time element, a six days' lead appears from the foregoing statement.

As to notice: the court found that the chattel mortgage was given *after* the none-of-your-business conversation in which Rosen told Phelps that if he lent Loupias the $12,000 he would have no security for it. The sufficiency of this finding is not challenged.

The contest is not between two lienors. It is between the holder of legal title and the holders of a lien created by a chattel mortgage. While the retention of title is sometimes spoken of as a lien (and is so spoken of in the findings herein) it is not a lien at all. "The security retained by the seller is not a lien, but is a reservation of title." (*Bice* v. *Harold L. Arnold, Inc.,* 75 Cal.App. 629, 635 [243 P. 468], citing 35 Cyc., p. 653). Followed in *Heffner* v. *Jackson,* 95 Cal.App. 476, 479 [273 P. 37]; also in *Hougham* v. *Rowland,* 33 Cal.App.2d 11, 14-15 [90 P.2d 860], where the court says "A conditional vendee receives nothing more than a conditional right of possession . . ." A conditional vendee is "in the position of a mere possessor." (*Guerin* v. *Kirst,* 33 Cal. 2d 402, 409 [202 P.2d 10, 7 A.L.R.2d 922].)

In *Oakland Bank of Savings* v. *California Pressed Brick Co.,* 183 Cal. 295, 297 [191 P. 524], the court said: "The owner of personal property has the right to make an agreement to sell the same and deliver possession thereof to the buyer, upon the condition that the title thereto shall, nevertheless, remain in the seller until the price agreed on has been

fully paid, and the title so withheld by the owner will, until full payment, be *superior to that of a subsequent mortgagee* or purchaser of such personal property from the buyer, *even if such subsequent mortgage* or purchase *was made without knowledge or notice of the reservation of title* . . . [citations].'' (Emphasis added.)

Loupias, as we have seen, had no title to the property when he attempted to mortgage it (see *Pacific Finance Corp.* v. *Hendley,* 119 Cal.App. 697 [7 P.2d 391], on the subject of chattel mortgages given by conditional vendees). At that time legal title was still retained by West Coast, but the transfer of August 25 had given Rosen a *potential* and *equitable title* as of that date. After making the Rosen-Loupias contract on August 25 Loupias could not by word or deed deny, defeat, impair or lessen Rosen's rights under that contract. (*Pacific Finance Corp.* v. *Hendley, supra.*) When, on October 15, 1947, Rosen paid West Coast the $12,362.22 balance (apparently in fulfillment of his agreement so to do) and got an assignment of its underlying contract, he stepped into its shoes and became vested with complete legal title to the machinery and equipment, which, as between him and Loupias, or those claiming under Loupias, related back to August 25.

This is not a controversy between partners, or between a creditor and a partnership wherein the creditor seeks to hold partnership assets or to trace and recover diverted assets. It arises simply from a loan made by one individual to another, to enable the latter to buy out his copartners and get sole control of a business.

Loupias' interest in the joint venture had been wiped out by losses. Rosen and Cochran on the other hand, had put into it about $31,000. Loupias admitted that he had no money at the time of the August transfer. The purchase of Ireland's interest gave Rosen and Cochran each 33⅓ per cent, or a two-thirds interest in the partnership between them. In these circumstances Rosen and Loupias arrived at their settlement. The balance of $12,000 was still owing to West Coast and a $12,000 loan of fresh money would get that out of the way. The transaction accomplished exactly what Loupias desired to accomplish. It amounted to an informal liquidation of the partnership, and no authority has been cited by appellants holding that this cannot be done. In respondent's brief the concession is freely and repeatedly made that such a transaction between the partners cannot defeat partnership credi-

tors suing the partners or pursuing the partnership assets thus taken over by one partner on such a liquidation.

The judgment is affirmed.

Nourse, P. J., and Dooling, J., concurred.

A petition for a rehearing was denied June 3, 1950, and appellants' petition for a hearing by the Supreme Court was denied June 29, 1950.